# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-0930-16T2
                     A-1195-16T2

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

      Plaintiff-Respondent,

v.

B.D.,

      Defendant-Appellant,

and

R.D. and I.L.,

      Defendants.

_____

IN THE MATTER OF V.D.
and S.D.,

      Minors.

_____

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

Plaintiff-Respondent,

v.

B.D.,

Defendant-Appellant,

and

R.D.,

Defendant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF V.D.,

a Minor.

_____

Argued March 6, 2019 – Decided April 8, 2019

Before Judges Alvarez and Reisner.

On appeal from Superior Court of New Jersey, Chancery Division, Family Part, Monmouth County, Docket Nos. FN-13-0203-12 and FG-13-0063-16.

Eric R. Foley, Designated Counsel, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Eric R. Foley, on the briefs).

Salima E. Burke, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Jason W. Rockwell, Assistant Attorney General, of counsel; Salima E. Burke, on the brief).

A-0930-16T2

Linda Vele Alexander, Designated Counsel, argued the cause for minor S.D. (Joseph E. Krakora, Public Defender, Law Guardian, attorney; Linda Vele Alexander, on the brief).

Lisa M. Black, Designated Counsel, argued the cause for minor V.D. (Joseph E. Krakora, Public Defender, Law Guardian, attorney; Lisa M. Black, on the brief).

PER CURIAM

After a twelve-day fact-finding hearing, at which defendant was represented by attorney Frank Howley, the trial court found that defendant repeatedly and brutally abused his daughters Val and Sarah.[1] In the August 6, 2013 fact-finding order, the court "determine[d] that the children were abused in that the father intentionally subjected them to various forms of pain and discomfort bordering on torture in a manner which amounted to excessive corporal and emotional punishment." Following a plenary custody hearing, the trial court transferred custody of Sarah to her biological mother who lived in Brazil, and terminated the Division's litigation with respect to Sarah. The Division then filed a guardianship complaint seeking to terminate defendant's parental rights to Val.

---

[1] We use fictitious names to protect the children's privacy. We note that the children are half-sisters. Defendant was not married to either of their biological mothers, and the girls were each born in May 2002. Defendant has three other children, who live with their mother in Connecticut.

A-0930-16T2

After a protracted guardianship trial, at which defendant insisted on representing himself, with stand-by assistance from Howley, the same trial judge found that the Division proved all four prongs of the best interests test, N.J.S.A. 30:4C-15.1(a), and ordered termination of defendant's parental rights to Val.[2] The October 13, 2016 order would enable Val, who is now almost seventeen years old, to be adopted by her godparents, with whom she has been living since she was ten years old.

Defendant initially appealed both the fact-finding order and the guardianship order, and we consolidated the appeals. However, because defendant's appellate brief did not present any issues challenging the fact-finding order, he has waived his appeal of that order.[3] See Midland Funding LLC v. Thiel, 446 N.J. Super. 537, 542 n. 1 (App. Div. 2016). In challenging the guardianship order, defendant argues that the court unfairly denied him

---

[2] On or about March 16, 2016, less than four weeks before the scheduled guardianship trial, defendant sent the Division a letter stating that he intended to represent himself at the trial. However, he did not present his request to the court until April 6, 2016, a week before the trial was to commence. After confirming with defendant and Howley that defendant had discussed the issue with Howley and still wished to proceed pro se, the trial court granted the request, over vigorous objections from the Division's attorney.

[3] Nonetheless, in analyzing defendant's challenge to the denial of visitation in the guardianship appeal, we considered relevant portions of the record of the fact-finding hearing.

4

visitation with Val, thus "tainting" its findings on prongs two, three and four. Defendant also contends that he did not receive a fair trial, because the trial court erroneously allowed him to represent himself and unfairly restricted his right to discovery. We conclude that the denial of visitation was justified and defendant received a fair trial. We affirm the guardianship order, and we dismiss the appeal from the fact-finding order.

I

In his first point, defendant contends that the trial court "effectively terminated" his parental rights at the 2012 hearing approving the children's emergency removal from his custody. Because defendant was not allowed to visit with the children during the pendency of the Title 9 and Title 30 cases, he contends he was placed at an impossible disadvantage in trying to regain custody of them. In another case, that argument might have some merit. But in this case, the evidence supports the trial court's decision to deny visitation, based on the children's strongly-expressed wishes and on the recommendations of all of the psychological experts, including defendant's own therapist. The record reflects that the Division made repeated and diligent efforts to provide therapy to all parties and to facilitate visits between defendant and the children. With the court's approval, the Division even arranged for one of the children's

5

therapists to meet with defendant's therapist. However, both before and after the fact-finding hearing, the children were staunchly resistant to visiting with their father. They expressed relief that they no longer lived with him and wanted nothing to do with him. Neither the children's therapists nor defendant's therapist recommended that the children be forced to visit with him.

Because this appeal only concerns Val, our discussion will now focus on her. The record of the fact-finding hearing illustrates the reasonableness of the court's decision to deny defendant visitation with Val unless her therapist recommended it.

The judge interviewed both girls in camera on the record. In her interview, Val described for the judge the pattern of physical abuse and emotional neglect that defendant inflicted on her. She described how her father made her kneel in the bathroom for extended periods of time as punishment, and how he slapped her and hit her in the head. She said that defendant also hit Sarah and required her to kneel in the bathroom. The kneeling was particularly painful, because defendant would not let the girls lean back and rest their weight on the backs of their calves, but required them to kneel upright, which hurt their knees.

A-0930-16T2

Val also told the judge that defendant's live-in girlfriend abused her, and when she told her father about the abuse, he did not believe her. Although the house had two bathrooms, on one occasion, the girlfriend came into the bathroom where the girls were kneeling, and defecated in front of them. Defendant also made Val spend extended periods of time walking on a treadmill.

Val recounted that her father made her feel fat and unloved, and that she felt like an outcast in the household. She poignantly described how she gave her father "I love you" notes and he threw them away. Val told the judge in no uncertain terms that she did not want to see her father. Val explained to the judge that her godparents loved her and encouraged her, unlike her father.

In her in camera interview, Sarah also described for the judge defendant's pattern of brutal physical abuse of both girls. According to Sarah, defendant hit and abused Val more than Sarah. Sarah corroborated Val's statement that defendant's girlfriend also abused them, and she told the judge that defendant treated his other children better than he did Val and Sarah.

At the fact-finding hearing, and again at the guardianship trial, the Division presented expert testimony explaining why defendant should not be permitted to have visitation with Val. In summary, his abuse caused her to develop deep-seated psychological problems, including post-traumatic stress

7

disorder (PTSD) and low self-esteem. She strongly desired not to see her father, due to his abusive conduct. Defendant undermined the Division's efforts to reunify defendant and Val, by his persistent unwillingness to acknowledge that he abused her and that she was deeply harmed by the abuse.

As a result, Val's therapists recommended that she not be forced to visit with her father against her wishes. One of her therapists testified that the possibility of a visit caused Val to feel suicidal, and she told the therapist she was afraid defendant would kill her. Defendant also undermined the reunification effort when he violated a no-contact order with Val. He unexpectedly appeared when Val was visiting his sister, and he had someone take pictures of him with Val, an event Val found quite upsetting. Defendant later tried to use the photos as evidence that he should be allowed to visit with Val.

At the fact-finding hearing, defendant's therapist, Marisol Mondaca, agreed with the recommendations of the children's therapists. Mondaca acknowledged that the children asserted defendant had abused them, and that since being removed from his custody, they refused to visit with him. She testified that in his therapy sessions, defendant denied that he ever abused the girls. While Mondaca felt she had a professional obligation to believe

8

defendant's version of events, Mondaca agreed with the children's therapists that the children should not be forced to visit with defendant. She agreed that it was important to wait until they were ready to meet with him.

Val has never reached that point. As her Law Guardian asserted on her behalf at oral argument of this appeal, Val has no desire to see her father.

The record strongly supports a conclusion that the Division made reasonable efforts to provide services and reunite defendant with Val, but defendant was unable or unwilling to take advantage of those opportunities. He caused the trauma that led Val to resist visitation. And, he was never willing to admit his own conduct or acknowledge its destructive effect on her. The trial court's decision not to force Val to visit with her father was supported by substantial credible evidence. See N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 427 (2012). Consequently, we reject defendant's argument that he was unfairly denied visitation. The judge's decision, that the Division satisfied the four prongs of the best interests standard, is overwhelmingly supported by the evidence. Ibid.

II

Next, we address defendant's argument that he was denied a fair trial because he was allowed to represent himself. Our Supreme Court recently

decided, for the first time, that a parent has the right to represent him or herself in a guardianship case. "Although a parent's decision to appear pro se in this complex and consequential litigation represents poor strategy in all but the rarest case, N.J.S.A. 30:4C-15.4 plainly authorizes that parent to proceed unrepresented." N.J. Div. of Child Prot. & Permanency v. R.L.M., 236 N.J. 123, 131-32 (2018).

However, the Court stressed that the right must be exercised knowingly, timely, and in a way that will not prejudice the child's right to an expeditious determination as to permanency.

> The parent's right of self-representation, however, is by no means absolute. That right must be exercised in a manner that permits a full and fair adjudication of the dispute and a prompt and equitable permanency determination for the child. The parent must inform the court of his or her intention to appear pro se in a timely manner, so as to minimize delay of the proceedings. He or she must invoke the right of self-representation clearly and unequivocally. In the event of such an invocation, the court should conduct an inquiry "to ensure the parent understands the nature of the proceeding as well as the problems she may face if she chooses to represent herself." The judge should take appropriate steps, which may include the appointment of standby counsel, so that the parent's decision to represent himself or herself does not disrupt the trial.
>
> [Id. at 132 (quoting In re Adoption of a Child by J.E.V. and D.G.V., 226 N.J. 90, 114 (2016)).]

Pertinent here, the Court provided the following guidance, based on its prior decision in J.E.V., a case involving a contested adoption:

> If the parent clearly and unequivocally invokes his or her right to proceed unrepresented, the court should engage in the "abbreviated yet meaningful colloquy" envisioned in the contested-adoption context in J.E.V., 226 N.J. at 114. That inquiry need not be as comprehensive as the colloquy mandated when a criminal defendant seeks to proceed unrepresented. The court, however, should be satisfied that the parent understands the nature of the termination of rights proceeding and the disadvantages of self-representation. J.E.V., 226 N.J. at 114.
>
> [R.L.M., 236 N.J. at 150 (additional citations omitted).]

The Court also emphasized the central importance of the child's rights in a guardianship case, noting that the trial court may take "appropriate steps" if a self-represented parent delays or disrupts the proceedings.

> As the Legislature has declared, the focus of a termination of parental rights proceeding is a determination of the child's best interests. N.J.S.A. 30:4C-15.1(a). No decision by a parent to proceed unrepresented should be permitted to impede a just and expeditious outcome for the child.
>
> [Id. at 151 (emphasis added).]

In this case, defendant's appellate argument centers on his contention that the trial court did not do enough to ensure that defendant understood the nature of the proceedings and the risks of self-representation. He also argues that he

11

did not, in fact, understand the proceedings, and that he was not capable of representing himself. We are not persuaded. Looking at the trial record in its totality, we conclude that defendant was adequately advised of the nature of the proceeding and the pitfalls of representing himself, made a knowing and voluntary decision to self-represent after receiving advice of counsel, and was able to present his case with the benefit of stand-by counsel.

We acknowledge that at the time the trial judge decided the self-representation issue, he did not have the benefit of our Supreme Court's decisions in J.E.V. and R.L.M. The judge mistakenly believed that defendant had an absolute right to self-representation, and perhaps for that reason, engaged in only a very truncated colloquy with defendant and Howley about defendant's decision to exercise that right.[4]

On the other hand, having presided over the Title 9 and guardianship cases for several years, and having heard defendant testify at the fact-finding hearing, the judge was quite familiar with defendant. Further, defendant's counsel,

---

[4] The judge explicitly stated his understanding of the law at a pretrial conference on April 25, 2016, when the Division's counsel asked the judge to order defendant to have an attorney, because defendant allegedly refused to participate in a court-ordered psychological evaluation and was otherwise delaying the proceedings. The judge stated that he had no authority to require defendant to be represented by counsel.

12

Howley, was present in court and briefly questioned defendant about his decision. Most significantly, defendant confirmed that he and Howley had discussed defendant's desire to represent himself; hence, defendant had advice of counsel in making his decision. The judge also briefly told defendant that he believed defendant was making a mistake and would have difficulty representing himself. Lastly, the judge kept the Title 9 case open, as a mechanism to ensure that Howley would remain in the case as defendant's stand-by counsel. Howley had been representing defendant since November 30, 2012, and was familiar with defendant and the guardianship litigation.[5]

The issue of self-representation was also revisited as the trial progressed. The trial, which was adjourned several times, finally began on May 31, 2016, with defendant representing himself and Howley acting as stand-by counsel. On the second day of the trial, June 8, 2016, in response to a question from the judge, Howley indicated that he had spoken with defendant about whether he had changed his mind about representing himself, and defendant still wanted to represent himself. Defendant then made an oral motion to disqualify the trial judge because he had decided the Title 9 case adversely to defendant. In denying

---

[5] A March 2, 2016 guardianship multipurpose order indicated that Howley represented defendant at the March 2 case conference and that the court set trial dates of April 13 and 14, 2016.

the motion, the judge explained the four prongs of the best interests test and assured defendant that he had not prejudged any of those prongs. Later on the same day, the judge further explained to defendant the difficulties that he faced in representing himself, in case defendant wished to change his mind.

This theme was repeated throughout the trial, when defendant had difficulty in framing questions, serving subpoenas, or otherwise understanding proper procedures. The judge repeatedly reminded defendant that he had brought those difficulties on himself and could avoid them by agreeing to let Howley represent him as an attorney. Defendant could have changed his mind at any time, and the court would have allowed Howley to take over the representation. But defendant insisted on representing himself, with Howley's assistance as stand-by counsel.

After reviewing the record, we conclude that defendant in fact was capable of representing himself, to the extent any pro se litigant could in such a case. We also conclude that he understood the ramifications of self-representation, and no miscarriage of justice resulted to him from granting his application to proceed pro se.

The trial certainly took longer than it would have had defendant been represented by counsel. But defendant was successful in presenting evidence to

14

support the major themes of his desired defense. Those themes were that he never abused his daughters and they lied about the alleged abuse; the Division's records were inaccurate and slanted against defendant; the godparents were flawed in their parenting ability, and Val was not doing as well in their care as the Division wanted the court to believe; Val's psychological problems were more likely caused by her removal from defendant's care, and by the godparents' poor parenting, than by anything that happened while she was living with defendant; the godparents were turning his daughter against him; and terminating his parental rights would do more harm than good by denying his daughter the ability to have contact with him.

As a practical matter, defendant understood that he could not force his daughter to return to his custody against her will, and that was not his goal. He wanted to have some continuing role in her life, so that he could visit with her and protect her from what he perceived as harm from the way the godparents were raising her. Defendant also did not believe that Val did not want to see him, and he hoped he could persuade her to renew a relationship with him. Those points came across clearly from his presentation.

The record also reflects that Howley assisted defendant as stand-by counsel. As our Court has recognized: "When standby counsel is appointed or

retained to assist a party, a trial court is in a position to conduct a fair and effective hearing, even if the litigant refuses to cooperate or declines to attend." In re Civil Commitment of D.Y., 218 N.J. 359, 378-79 (2014). In this case, defendant attended and participated in the trial, with Howley's able assistance. In addition to providing defendant with advice, Howley conducted the direct examination of defendant when he testified at the trial. With Howley's assistance, defendant raised numerous objections on grounds including hearsay and leading questions, some of which the judge sustained. Throughout the trial, the judge overruled objections from the Division's attorney that Howley was participating too actively in the trial. The judge stated that the court was grateful for all of Howley's participation.

On this record, the judge could have denied defendant's request to represent himself, on the grounds that it was untimely and would delay the trial, to the prejudice of the child's rights. See R.L.M., 236 N.J. at 152-53. However, we cannot find that the decision to allow self-representation was an abuse of discretion or unfair to defendant. See State v. DuBois, 189 N.J. 454, 475 (2007). Importantly, defendant had advice of counsel before deciding to self-represent, which supports our conclusion that he knowingly and voluntarily waived his right to counsel. Defendant also had assistance from Howley during the trial.

16

Accordingly, we reject defendant's argument that the court erred in allowing him to proceed pro se.

III

Next, we address defendant's discovery argument. After deciding that defendant could represent himself, the trial court ruled that defendant would be permitted to inspect the Division's files at the agency's office but he could not take a copy with him. Defendant contends that he should have been permitted to take copies of the files with him to assist in his trial preparation, and because the Division and Law Guardian attorneys had copies of the files, he was at an unfair disadvantage in preparing his case.

We review a trial court's discovery order for abuse of discretion. State in the Interest of A.B., 219 N.J. 542, 554 (2014). However, we cannot defer to a decision that the trial court fails to explain. Ibid.; Flagg v. Essex Cty. Prosecutor, 171 N.J. 561, 571 (2002). As we have often stated, we cannot engage in meaningful appellate review of a decision where a trial court does not make findings of fact and conclusions of law. E.g. Salch v. Salch, 240 N.J. Super. 441, 443 (App. Div. 1990). While the trial court provided insufficient justification to deny defendant the right to keep a copy of the discovery, we find no grounds to reverse the guardianship judgment.

A-0930-16T2

By statute, the Division's records concerning child abuse are confidential. N.J.S.A. 9:6-8.10a(a). However, in certain circumstances, the Division "shall release" records, but always subject to some review by the Department, a court, or an administrative law judge, and only to the extent necessary. For example, the Division "shall release" records to a court or the Office of Administrative Law, which may in turn "disclose[]" the records to an attorney "or other appropriate person" if necessary to determine an issue in dispute:

> A court or the Office of Administrative Law, upon its finding that access to such records may be necessary for determination of an issue before it, and such records may be disclosed by the court or the Office of Administrative Law in whole or in part to the law guardian, attorney, or other appropriate person upon a finding that such further disclosure is necessary for determination of an issue before the court or the Office of Administrative Law[.]
>
> [N.J.S.A. 9:6-8.10a(b)(6) (emphasis added).]

The Division shall release records to a "person . . . and his attorney" for purposes of appealing a substantiated finding of child abuse. The Division is to release the records to

> [a]ny person appealing a department service or status action or a substantiated finding of child abuse or neglect and his attorney or authorized lay representative upon a determination by the department or the presiding Administrative Law Judge that such

> disclosure is necessary for a determination of the issue on appeal[.]
>
> [N.J.S.A. 9:6-8.10a(b)(12) (emphasis added).]

The Court Rules pertaining to proceedings filed by the Division do not specifically contemplate discovery by pro se parties, except, inferentially, by leave of court. Rule 5:12-1(e) provides that the Division shall provide copies of its trial exhibits "to the court and to counsel for all parties . . . ." Except for trial exhibits, the Division's "case file" shall be available "for inspection" by the parties' attorneys. Ibid. However, "[a]ll other discovery by any party shall be permitted only by leave of court for good cause shown." Ibid. Rule 5:12-3 contains the same provisions.

Research does not disclose any cases addressing the right of a pro se guardianship defendant to obtain copies of Division records, perhaps because the Court has only recently held that guardianship defendants have a right to represent themselves. See R.L.M., 236 N.J. at 131. At least one case has inferentially recognized that it may be appropriate to prohibit a criminal defense attorney from giving a client copies of Division records, where the same attorney is representing the client in a Title 9 case and a criminal case arising from the same conduct. N.J. Div. of Youth and Family Servs. v. N.S., 412 N.J. Super. 593, 640 (App. Div. 2010) ("Additionally, a prohibition on providing

19

photocopies of various records to parent-defendants could be effectuated."). We also note that, in response to our question at oral argument, defendant's counsel advised that when he represents clients in Division cases, he does not give his client copies of the Division's records. We do not minimize the Division's concern that some pro se litigants may improperly disclose or misuse confidential records.

Further, even in cases where there are no statutes limiting disclosure of records, the Court Rules permit a party to apply for a protective order limiting discovery to inspection rather than copying, or imposing other limitations, where good cause is shown. See R. 4:10-3(b), (c).

In this case, in response to defendant's letter stating that he was proceeding pro se and asking for discovery, the Division filed an emergent application with the trial court seeking to limit defendant's access to the agency's files. In particular, the Division, joined by the Law Guardian, asked the court to allow defendant to inspect the Division's records and take notes, rather than photocopy the documents and take them home with him. The Division also asked the judge to allow defendant to designate trial exhibits for copying, but require him to leave copies of his trial exhibits in a separate file in the Division offices or in the courthouse rather than taking his trial exhibits home.

The Division argued that, as a non-lawyer, defendant could not be trusted to safeguard the confidentiality of the documents and he might disseminate or otherwise misuse them. The Division also argued that its files contained confidential information about Sarah, who was not part of the guardianship litigation. The Division further contended that Val's resource parents were entitled to protection of their confidential information. The Law Guardian argued that the Division's records contained "confidential medical information" about Val that she did not want released to defendant in light of the case history.

On April 13, 2016, the trial court entered a detailed order setting forth the conditions under which defendant could inspect the Division's confidential files. The order did not limit the types of documents defendant could inspect, but it prohibited him from taking home copies of the documents. Unfortunately, in granting the Division's application for discovery limitations and denying defendant's request to keep copies of the documents, the trial court did not make findings of fact or conclusions of law to justify its decision.

For example, the trial judge did not make any contemporaneous factual finding that defendant could not, or would not, keep the discovery documents confidential or that he would misuse them. Instead, the judge simply deferred to the views of the Division's attorney and the Law Guardian without making

21

any findings of fact or conclusions of law. After the trial was over, in his oral opinion deciding case, the judge briefly stated that defendant "couldn't take the files home. Nevertheless that's with the understanding that those files are confidential and as a non-attorney [he] couldn't be relied on not to release those files." Absent further findings, that general assertion was insufficient to deny a pro se litigant the same right that the attorneys in the case had, to obtain a copy of the trial exhibits.

On this appeal, the Division argues that there were additional factors that would support the judge's decision. The Division points out that defendant violated a no-contact order, tried to manufacture favorable evidence while engaging in prohibited contact with Val, and likely made false reports of wrongdoing against the godparents. Those factors could militate in favor of limiting defendant's manner of obtaining access to the Division's confidential records. However, the trial court did not make findings about those incidents in deciding the discovery issue. We are therefore compelled to conclude that the judge's discovery decision, essentially reached by default and with no specific factual findings or legal conclusions, was a mistaken exercise of discretion. In another case, an unexplained limitation on a defendant's access to discovery might warrant reversal and a remand for a new trial. But not in this case.

22

In this case, defendant had many weeks to review the files, including the Division's trial exhibits, at the Division's offices and at the courthouse. He was permitted to select his exhibits for copying, and kept them in a separate file at the courthouse for use at trial. A careful reading of the trial transcripts reveals that defendant was very familiar with the records and used them effectively to support the themes of his case. For example, in his opening statement, defendant pointed out details he had noted in the records, showing that witnesses had changed their versions of events over time. He also brought out that information while cross-examining the witnesses.

In his oral opinion deciding the guardianship case, the judge noted that defendant introduced almost thirty documents in evidence, and noted that defendant's underlinings on the documents "indicat[ed] that he knew exactly . . . the factual scenarios he wanted to produce." In short, while the judge misapplied

23

discretion by failing to support his decision with findings of fact or conclusions of law, the error does not warrant a new trial.[6]

To put it bluntly, this was a hopeless case for defendant, regardless of the manner in which he received access to discovery. Defendant brutally abused Val, and as an articulate teenager, she was able to graphically describe the abuse and express her unmistakable wish to have no contact with defendant. The trauma Val suffered was well-established by expert testimony, as was her lack of a relationship with defendant, and his lack of empathy or remorse. Val had bonded with her resource family and they were prepared to adopt her. Despite the difficulty of his legal and factual position, defendant was able to effectively make the points he believed were important, even if it took him longer than it might have if he had been allowed to keep copies of the discovery. In these circumstances, limiting his discovery to inspection of the documents did not produce a miscarriage of justice. See R. 2:10-2.

---

[6] Nor is this the appropriate case in which to provide detailed future guidance concerning discovery by pro se litigants in guardianship cases. The briefs we received are inadequate for that purpose, the record is inadequate, and we have no meaningful input from the trial bench, whose expertise we value. See Cesare v. Cesare, 154 N.J. 394, 412 (1998). The issue, with all of its practical ramifications, may be appropriate for consideration by the Family Practice Committee.

A-0930-16T2

On the other hand, reversing the termination order and remanding this case for yet more proceedings would work a gross miscarriage of justice to Val. As previously noted, after enduring years of abuse from defendant, Val has no desire to see him, has not seen him in years, and has no relationship with him. She has bonded with her godparents, who are her psychological parents, and she fervently wishes to be adopted by them. Defendant's abuse caused Val tremendous harm, a reality he refuses to acknowledge. She has suffered PTSD, self-cutting, and depression. Val's therapist, Dr. Milleman, testified that Val will suffer continuing psychological harm, as long as this litigation is ongoing and the possibility of reunification with defendant is hanging over her. The trial judge credited that testimony. Val will turn seventeen in May 2019. The interests of justice would be disserved by remanding this case for more litigation.

IV

Lastly, we briefly address post-trial information, with which we permitted defendant to supplement the record. While this appeal was pending, defendant produced evidence that he has been reunited with Sarah, who decided to move back to the United States and live with defendant, after living with her mother

A-0930-16T2

in Brazil for several years.[7]  Defendant argues that the reconciliation with Sarah is proof that he is a fit parent, and is evidence that Val too could overcome any reluctance to visit with him.  We cannot agree.

As is clear from this record, Val and Sarah are different children with different circumstances.  In his trial testimony, defendant acknowledged some of those differences.  As he described them, Sarah had a stronger personality, was not particularly gifted academically, and tended to misbehave, while Val was more even-tempered, obedient, and a brilliant student.  The record reflects that defendant and his paramour inflicted greater psychological and physical abuse on Val.  Unlike Val, whose biological mother disappeared, Sarah had the support of her biological mother with whom she lived in Brazil.  The fact that Sarah was resilient enough to overcome the effects of defendant's abuse, to the point where she could reunite with him, does not mean that Val has the same capacity.

---

[7] Unlike Val, Sarah eventually showed some willingness to visit with her father. By January 4, 2013, Sarah was willing to attend a family wedding at which defendant was present.  However, Sarah also wanted to move to Brazil to live with her mother.  After an extended change-of-custody hearing, the trial court transferred physical custody of Sarah to her mother, and permitted Sarah to relocate to Brazil.  Some years later, Sarah decided that she missed her father and preferred to live in the United States.

A-0930-16T2

Sarah's willingness to reconcile with her father does not justify requiring Val to renew a relationship with him, nor does it justify delaying Val's right to permanency. After Val turns eighteen, she can decide for herself when, if ever, she is ready to reconcile with defendant. In the meantime, she is entitled to permanency, a goal that to date has been stymied by this years-long litigation. Val was ten when the Division removed her from defendant's custody. She is about to turn seventeen. Nothing in the supplemental materials justifies denying Val the permanent adoptive placement she so badly needs and wants.

Affirmed as to A-0930-16; dismissed as to A-1195-16.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION